The judgment of the court (Rost, J. recusing himself on account of interest,) was pronounced by
Slidell, J.
In the first article of the will* the testator names three persons as his testamentary executors. In the second, he directs that in the event of their absence, resignation, or death, their places are-to be filled by one or two commissioners to be appointed by the Governor of the State, and any one of the Judges of the Supreme Court and the Judge of the First Judicial District Court, or any two of them. The commissioners are to have a yearly salary of fifteen hundred dollars each; they may be dismissed by any two of the judges for criminal conduct; they are to keep a set of books, to be examined and approved annually by any two of the judges. In the third article, he directs that his estate is not to go into court except for the purpose of probating the wills, and that every thing belonging to his estate is to be continued and conducted as it may be found at liis death. He orders the executors or commissioners to keep on each of his plantations a skilful and humane superintendant. He gives instructions for the food, treatment and discipline of the negroes. In the sixth, seventh and eight articles, he directs the gradual liberation of his slaves. In the ninth, he says: “The Destrehan estate is to remain forever asa part of my succession; and at the end of twenty-five years from my death, it must be laid out into a city to be named Destrehan.” In the tenth, he says : “Four acres, including the back and front garden, running back with parallel lines to the lakes, with all the dwellings, are to remain as one lot, with a good street and buildings on each side of the street.” In the eleventh, he says: “All *459 my real estate in the city to remain upon ground rent, and no lease to exceed twenty-five years in time. All the stocks to be sold in ten years from my death.”
In the twelfth article, he bequeaths to his brother John Henderson, or his heirs, if he be dead, two thousand dollars per annum ; a like amount to Ann Henderson or her heirs, to Stephen Henderson or his heirs, to the children of George Henderson or his heirs; two thousand- dollars annually to the poor of New Orleans, to be distributed by persons appointed for that purpose by the governor, &c.; two thousand dollars per annum to the poor of Dunblane, in North Britain.
In the thirteenth article he says: “ When funds can be spared after twenty years, I wish a large manufactory of negro shoes and coarse clothes to be erected at Destrehan, under the direction of experienced workmen from Scotland. Destrehan city must be incorporated by an act of the Legislature. If these manufactories are well conducted, it will be the means of doing much good to the country, and give employment to a great many of the poor, and it will no doubt be the means of stimulating a great many of the young men to exert themselves, because, by perseverance and industry, they see what can be done.”
In the fourteenth article he directs “that after the first five years the executors will divide the following sums amongst the four following congregations, say, Clapp’s Church, two thousand dollars; Catholic Cathedrel, two thousand dollars; the English Church on Canal street, two thousand dollars; and the church commenced by Maffit, two thousand dollars; and to the Orphan Boys, two thousand dollars; and to the Female Orphan Society, tofo thousand dollars; the legacies to the four churches is only to remain and be payable for five years, but all the others so far named are .to be perpetual. Two thousand dollars per annum to the Charity Hospital. Five hundred dollars per annum to the Firemen’s funds.”
In the -fifteenth article he says: “ I wish a chapel or church to be erected *460 ■upon the upper corner of the four acres lot, and a Presbyterian minister to be sent for from Dunblane or its neighborhood, at a moderate salary; I also -wish a good house for the minister to be erected upon the lower corner of the four acres lot; there must also be a small house for the education of. the poor of the town, over which the minister must preside.”
In the seventeenth, he changes the name of the proposed city from Destraban to Dunblane.
The provisions in the will for laying out one of his plantations at the end of twenty-five years into a city to be called Dunblane, and establishing a manufactory in it, are, in my opinion, an attempt to perpetuate his succession and violate the policy of the law. It must be observed, that the future city was not to pass from his succession, but to remain forever a part of it. If lie had bequeathed the Destrchan plantation to a contemplated charitable corporation, not in esse, but thereafter to be incorporated, then the disposition would have been like that in Mylne’s case. But here the future city was to remain in his succession. What he says of an incorporation seems to me to be in quite another sense. It was, that an act of incorporation for the purposes of municipal government should be obtained. A number of villagers ask the Legislature to incorporate them as a cily, and the Legislature does so. What is the effect of such an incorporation? A mere provision for the purposes of municipal government. The lands and the houses remain the property of the respective villagers. So here, the succession of Henderson would still remain the owner of the Destrehan lands after the city of Dunblane was established upon them and incorporated. The rents of the tenements, the products of the contemplated manufactory, the fruits of the soil, would have still belonged to his succession, and been collected and gathered by his executors. There is not a word in the will that takes the ownership of the proposed city out of his succession. But that, *461 if carried into effect it takes it out of commerce forever, is indisputable. He expressly orders, “it is to remain forever as a part of my succession.” The executors might lease, but could not sell. In this particular the provision is not peculiar. His intention was the same as to his real estate in the city. It was to remain upon ground rent, and “no lease to exceed twenty-five years intime.” The conclusion, indeed, from the entire will, is irresistible, that the testator deshed to perpetuate a large portion of his succession, and that this was the dominant idea under which it was composed.
It is said that the provisions of the will do not amount in law to a substitution or a jidei commissum, and consequently are not reprobated by law. Conceding that they do not fall technically under either of these denominations, still they are clearly opposed to the policy of our laws and jurisprudence, which resists the perpetuation of estates. Their spirit is to prevent property from being tied up for a length of time in the hands of individuals, and placed out of the reach of commerce. If it would be illegal for a testator “to leave his property to any person or set of persons with the charge to preserve it, and to transfer it at their death to some persons designated,” as conceded by the learned counsel in his brief a fortiori, is it unlawful to tie it up in the hands of the executors and commissioners forever.
As to the provision in the fifteenth article for the erection of a chapel, and a house for the minister, his salary, &c., it is clear that this provision is most intimately connected with the scheme of establishing on the Destrehan plantation the town of Dunblane, and populating it with workmen from Scotland, as directed in an antecedent part of the will. It is so interwoven with that portion of the will as to be dependant upon it and legally indivisible. The nullity therefore, of the one carries with it the nullity of the other. It is impossible to deduce from the will itself the conviction that the article in question would have *462 been adopted, if the testator had known that his desire with regard to the town and manufactory could not be accomplished. On the contrary, the opposite conclusion is unavoidable.
The sixth and seventh clauses of the will contain provisions respecting the sending of his slaves to Africa, the disposition to be made of such as do not wish to go, áte.; and the eighth article is as follows : “Some arrangements must be made with Henry JDoyal, who is one half owner of the Mount Houmas plantation and slaves, by selling the land to him at the end of the first five years; he, in the meantime, must liquidate his account at his leisure, paying no more interest upon any balance that may be due to my estate than six per cent per annum; the negroes upon the Houmas estate to be emancipated upon the same conditions as those upon the other plantations, one-half of them being already my property. Mr. JDoyal would no doubt make an agreement with the executors for those belonging to him; every thing, however, must be settled with Mr Doyal within ten years after my death; be has been a faithful agent and partner in the management of these estates. I therefore recommend him to the indulgence and notice of the executors.”
The court, not being at present prepared to express an opinion upon the testamentary provisions as regards the slaves generally, has, under the written agreement of the parties, retained that portion of the cause for further consideration. But whatever may be our conclusion upon the general question, there is abraneh of it as to which our opinion is formed, and which it is proper to act upon now, as it appears from the statements of counsel, the distribution of a large amount <of funds is dependent upon it.
Mr. Doyal has protested against this disposition of the will; has notified the executors of his refusal; and has appeared in this suit by counsel, for the purpose of resisting this interference with his property.
*463 We are of opinion, that even if we should come to the conclusion hereafter, , „ . . . ,, , . , , . - that the provisions concerning the slaves generally on the various plantations lett by the testator,are valid and can be carried into effect, DoyaVs share of the slaves cannot be affected by the dispositions of the will without his consent; and that so far the dispositions of the will must fail. Hence, if the disposition as to the testator’s interest in the Houmas slaves be hereafter declared valid and practicable, all the executors can do, will be to provoke a proceeding in the nature of a partition in kind of the slaves, and carry out the benevolent dispositions of the testator in behalf of those that may fall upon such proceeding, to the succession of Henderson.
As, however, the members of the court are not unanimous upon this point, it is proper that the reasons which have induced the majority to come to this conclusion should be stated at length; and in doing so, it is necessary to notice in detail what was said by the testator, and what has been done by the residuary legatees, by the executors, and by Doyal.
The eighth clause of the will is considered by Judge Preston as indivisible; in other words, as authorizing a sale of the undivided half of the plantation to Doyal, only in case he should consent to sell his own half of the slaves. In this opinion we do not concur. Mr. Doyal was the owner of an undivided half of the land and slaves. He had been a faithful agent and partner; the testator appreciated his fidelity and the propriety of rewarding, it by indulging him in the payment of what he owed, and giving him an opportunity of buying the outstanding half of the land at private sale. He did not desire to expose a faithful agent and partner to the inconvenience of cutting up the land by a partition in kind, or the competition of a public sale of the whole by a decree of partition which might result in bringing in a stranger as co-proprietor with Doyal. But Doyal, being an owner, was not bound to sell his undivided half of the slaves. He might not desire to part with them, from feelings of attachment, or conside *464 rations of interest. And to suppose that the testator desired to coerce him into such a sale of his slaves by withholding a sale to him of the land except upon those terms, is inconsistent with the indulgent and grateful disposition towards him which the will exhibits.
We, therefore, conclude that the testator desired that a sale of the land on easy terms should be made to Doyal. That he desired also, that his executors should buy Doyal’s half of the slaves, so that the whole might be emancipated. But that he did not intend to withhold the sale of the land if Doyal refused, and was aware that in that event his testamentary disposition would operate only on the undivided half of the slaves attached to the Houmas estate.
Let us now examine the power of attorney given by the residuary legatees to Most and Montgomery; premising that the testator himself intimates in his second will his doubts as to the validity of portions of his first will, by directing that any property not passing for any cause whatever under the first will should accrue to the legatees under that will; and premising also, that the residuary legatees have, throughout, contested the validity of that portion of the first will which proposes the emancipation of the slaves.
In the act of 7th April, 1839, these residuary legatees, who, in tho absence of a will, would have been heirs of the deceased, having extinguished, by compromises, the claims of other legatees, and thus become the owners of the entire property of the succession, subject, however, to such valid charges as the testator may have imposed upon it, made transfers, partly to each other, of various portions of the testator’s property, and among others of three plantations and the slaves attached thereto. But in order to secure to the slaves their ullimate rights, such as they might be, judicially ascertained under the wills, the transferrees of the respective plantations and slaves covenanted, that should the courts having jurisdiction in the matter decide that the slaves belonging to the respective plantations are entitled to be sent to Africa and receive one hundred dollars each, then they would comply with the directions of the will, and support the charges of its execution in that particular; and, on the other hand, would receive a deduction from the price of twenty per cent on the appraised value of the slaves. They also constituted' P. A. Most and Jonathan Montgomery their attornies, with authority to administer all the property of the succession undisposed of, to collect debts, settle accounts, pay creditors, and close the estate. They also authorized them to sell to Doyal the undivided half of the Mount Houmas plantation and slaves “for and in consideration of the sum of one hundred and twenty-five thousand dollars, payable in five equal installments from the day such sale shall have been made, and under the following conditions, to wit: That in case the Court of Probates for the parish and city of New Orleans, or the court having jurisdiction in the matter, should decide that the undivided half of the slaves belonging to the succession of the late Stephen Henderson, are to be sent to Africa, in obedience to the last will of the said late Stephen Henderson, and are entitled to receive each one hundred dollars, and in the event that the said Henry Doyal should, in such case, agree to receive a sum of money to consent that his own half of the said slaves shall also be sent to Africa on the same conditions, then the said Henry Doyal shall bind himself to comply with such part of the judgment of said court on the subject; and that in such case a deduction of twenty per cent on the appraised value of the slaves, as the same are appraised in the inventory, shall be made from the first installment of the purchase price of the said plantation and slaves. That in the event the said Henry Doyal shall refuse to purchase the undivided half of said plantation and *465 slaves on the conditions herein specified, an action of partition shall be instituted against the said Henry Doyal, and the Mount Houmas plantation will be sold at public auction in order to effect said partition.”
What is the meaning of this power, which is certainly inartificially expressed, and is not free from obscurity ? Does it mean that the attornies shall not sell to Doyal except upon the double condition that he will let Henderson’s half of the slaves go to Africa if the judgment of a court of competent jurisdiction should sustain the validity of the testator’s will respecting those slaves, and will also agree to receive a sum of money to consent that his own half shall be sent to Africa ? Or does it mean that the attornies, if unable to obtain such consent, may still sell to Doyal upon conditions that he will bind himself to comply with the judgment as to the half of the slaves; leaving his consent or refusal as to his own half open for future negotiation? The question is not free from difficulty, looking merely at the instrument itself. But it loses its importance when we consider the manner in which this obscure power was presently thereafter executed by the agents, Rost and Montgomery, and the subsequent acquiescence of their principles. A few weeks after the execution of this power of attorney, we find Doyal and the agents meeting before a notary, to pass the act of sale under which he now holds Henderson’s undivided half of the Houmas plantation and slaves. The act commences by recitals. It refers to the eighth clause of the will, the recommendation of the testator that the half of the land should be sold to Doyal; the indulgence proposed by the testator to be extended to him in liquidating his account, the testator’s desire that all the Houmas slaves should be emancipated, one-half of them being already his property, and that an agreement to that end should be made with Doyal by the executors. It declares, that by virtue of the will, he, Doyal, claims the right of purchasing the undivided half of the Houmas plantation and slaves belonging to the succession at a reasonable price, to be fixed by experts in case the parties could not agree upon the same. Doyal then declares, that “whereas the said late Stephen Henderson did, by the said last will, direct his testamentary executors to make some arrangement with him, the said Henry Doyal, and to pay him a certain sum of money to consent and permit that all the slaves attached to the said Mount Houmas plantation may be emancipated and sent to Africa, in the manner and at the time provided by the last will of the said late Stephen Henderson,, and that the said slaves receive each one hundred dollars. Now he, the said Henry Doyal, here declares, that he does hereby expressly refuse his assent to the execution of this or any part of the last will of the said late Stephen Henderson, relative to the emancipation of the said slaves attached to the Mount Houmas plantation, and as owner of the undivided half of all the said slaves, he objects to their emancipation, and formally denies the right of the said late Stephen Henderson, to emancipate any of the said slaves without his consent.”
Doyal then proceeds to declare, that he has taken cognizance of a deed of compromise made between the residuary legatees John Henderson and others, with certain other legatees of the deceased, and the extinguishment of the interest Of the latter; also of a compromise between the residuary legatees their agreement for the disposal of the remaining property, stocks and credits of the succession, and the powers granted to Henderson and Rost; their agreement to sell the undivided half of the Houmas plantation and slaves to him, and the grant of power to Rost and Henderson to sell to him ; and he declares that he consents to accept the sale proposed to be made to him as aforesaid. “Wherefore,” says the act, “ by reason of the foregoing, and in conformity with and by *466 virtue of the powers granted to the said parties of the first part (Rost and Montgomery,) the said Rost and Montgomery sell to Royal the undivided half of the plantation and slaves.” After fully describing the land and slaves, reciting the titles under which Henderson and Royal respectively held by undivided moieties, stating the price, $125,000, the promise of Royal to pay it in conformity with the terms and conditions fixed by the said legatees in the aforesaid compromise, and in the powers conferred unto their said attornies, describing the notes given by Royal, &e., the act concludes with the following clause: “It is further agreed and understood by and between the said parties hereto, that the present sale is made and accepted under the condition that in case the Court of Probates for the parish and city of New Orleans, or any court having competent jurisdiction in the matter, shall decide that the undivided half of the slaves attached to the said plantation and belonging to the estate of the said late Stephen Henderson, are to be sent to Africa in obedience to the last will of the said late Stephen Henderson, and are entitled to receive each one hundred dollars, the said Henry Royal shall, as he does hereby bind himself, comply with such part of the judgment of said court on the subject, and that in such case a deduction of twenty per cent on the appraised value of the said slaves as the same are appraised in the inventory of the said plantation and slaves made by the Hon. Edward Ruffel, parish judge, in and for the parish of Ascension, on the 6th day of April, 1838, shall be made from the first installment of the purchase price of the said plantation and slaves, or from any other installment of the said purchase price as the said parties may agree upon.”
The legal effect of this act I conceive to be, that Royal binds himself to carry into effect a judgment, if such be rendered, recognizing the validity of the testator’s disposition for the liberation of his half of the slaves; but does not bind himself, and, on the contrary, expressly refuses, to sell his own half so as to enable the parties to carry out Henderson’s desire to emancipate the whole. Royal’s half was not affected before the act of purchase, by the testamentary disposition of his co-proprietor. He considered himself as having an equitable claim under the will to demand a sale of the undivided half of the land, even if he refused to sell his half of the slaves. Standing on his rights as owner, he refuses that consent, but agrees to execute the testator’s wishes respecting the testator’s own half, which alone the testator could control, if a court of competent jurisdiction should adjudge the validity of Henderson’s will respecting the liberation of his share of the slaves. To this view of the matter the agents must be considered as assenting. Else, why did they not insert in the act an express covenant on Royal’s part to sell his undivided half? and why also did they not agree upon the price to be paid to Royal ? Flow is it that the act speaks as to Henderson’s undivided half and is silent as to the other ? It cannot be said that the meaning in the power is that Royal is to be allowed twenty per cent on the appraised value of the slaves — the whole slaves. I understand the power as adopting that standard as to the undivided half proposed to be sold to Royal, and contemplating a sum of money to be fixed by future agreement for the purchase of Royal’s undivided half.
The true test of the legal effect of the act of sale to Royal is, to enquire whether upon that act the residuary legatees, or the executors, or any one else could, by suit, compel Royal to give up the whole of the slaves upon receiving either the twenty per cent of the appraised value in the inventories, or an estimated value of one-half of the slaves with a deduction of twenty per cent upon the purchase price of the other half. After the most careful investigation which I *467 have been able to give to his contract, I am unable to say that I could consent to a judgment taking the whole of the slaves from him without his consent.
In the construction of all instruments, it is the duty of the court to collect the intention from the whole instrument taken together; and I concede that even matter put by way of recital in an instrument may sometimes amount to an agreement. But I am unable to perceive how in this case the reference to the power of attorney, itself of difficult interpretation, can create by implication a promise to do an act which the party in express terms refuses to do.
It is said that a partition cannot be had, if the validity of the testamentary disposition touching the undivided half of Henderson should be her'eafter adjudged, because the estate of Henderson has ceased, by the sale to JDoyal, to be a co-proprietor. It has ceased to be co-proprietor, but only sub modo. If such validity should be adjudged, the moiety upon which the will of the deceased will operate can be ascertained by a proceeding in the nature of a judicial partition. Doyal is bound by his covenant to submit to such a division.
In conclusion, I have to observe that not only does the execution of the power show how it was understood by the agents, and the acquiescence in that execution how it was understood by the principals; but the pleadings of the executors point to the interpretation which I have given, and the argument of their counsel admits its correctness.
In the answer of the executors in this cause they say, as one of the reasons why they should not give up the assets in their hands to the residuary legatees, “ that a sum equal to the amount to be paid under the will to Henry Doyal, if he should be compelled to sell his undivided half of the slaves attached -to the Mount Houmas plantation, must also remain with the executors, the eventual claim of Doyal being one of the charges, and indeed a debt of the succession.” “ That the said Henry Doyal has served upon the executors a protest by notarial act, against that portion of the will which directs his undivided half of the slaves upon the Mount Houmas plantation to be purchased from him, so that they may be sent to Africa, and that it is necessary he should have notice of these proceedings.”
And in the brief filed in behalf of the -executors in this court, the counsel of the executors say: “ But with regard to the slaves owned jointly by the deceased and Henry Doyal, we apprehend their fate can hardly be finally decided in this case as it presents itself under the agreement. When in the .8th article of the will the testator prescribes the arrangements to be made with Doyal, it is little else than a desire he expresses, the realization of -svhich he endeavors to render easy by the advantages he confers, and the friendly disposition he exhibits towards his partner. This clause, however, taken abstractly, would seem not to be executable, as there is no law that can compel a man in such a case to cede his property. The consent of Mr. Doyal might have easily settled the difficulty. But as he has peremptorily l’efused it, we should think that the benefit which the testator intended to .confer on all the slaves of the Houmas plantation, can, at best, attach only one-half of them. A partition in nature of the slaves, held in common .by the testator and Henry Doyal, might be effected, and would become, the means of attaining, in part at least, the end proposed by the will. The slaves falling to the lot of the testator might be enfranchised in the same manner as those which he owned exclusively.”
It is therefore decreed, that the ninth, tenth, thirteenth, fifteenth and seventeenth .clauses of said will, as set forth in the schedule annexed to this decree as *468 part thereof, are, and they are hereby declared null and void. And it is further decreed, that the provision in the said will contained, touching the liberation of the slaves attached to the Houmas plantation, if they should hereafter be decreed valid, can only operate upon su.ch portions of said slaves as may on a proceeding in the nature of a judicial partition in kind fall to the succession of said Stephen Henderson the testator, and not upon the portion of said Hoyal. And it is further decreed, that this decree shall become final within the usual delay without reference to such portions of the cause as, under the agreement of the parties on file in this cause, are reserved for further consideration and decree.
And it is now ordered, that the questions in this cause touching the liberation of the slaves of said succession, except so far as in the foregoing decree they are determined, be reserved for further consideration by this court.
Schedule, “Art. 9. The Destrehan estate is to remain forever as a part of my succession, and at the end of twenty-five years from my death it must be laid out into a city, to be named Destrehan.”
“ Art. 10. Four acres including the back and front garden, running back with parallel lines to the lakes, with all the dwellings, to remain as one lot, with a good street and buildings upon each sid.e of said street.”
“Art. 13. When thp funds can be spared after twenty years, I wish a large manufactory of negro shoes and coarse clothes to be erected at Destrehan, under the direction of experienced workmen from Scotland. Destrehan city must be incorporated by an act of the Legislature. If these manufactories are well conducted, it will be the means of doing much good to the country, and give employment to a great many of the poor, and it will no doubt be the means of stimulating a great many of the young men to exert themselves, because by perseverance and industry they see what can be done.”
“Art. 15. I wish a chapel or church to be erected upon the upper corner of the four acres lot, and a Presbyterian minister to be sent for from Dunblane or its neighborhood, at a moderate salary; I also wish a good house for the minister to be erected upon the lower corner of the four acres lot; there must also be a small house for the education of the poor of the town, over which the minister must preside.”
“ Art. 17. Upon mature reflection, I have concluded to name the Destrehan plantation, when it is incorporated as a city, Dunblane, inplg.ee of Destrehan as named in the foregoing.”

Thisis my last olographic will and testament,, made and done at the city of JSTew Orleans, this 1st day of August, 1837, in the presence of the almighty and eternal God, I humbly and solemnly approach the throne of grace, hoping that through our Lord Jesus Christ forgiveness of all my sins, Amen.
Art. 1st. I nominate and appoint Stephen Henderson, Jr., Jonathan Montgomery, and P. A. Rost, Esqrs , to be my testamentary executors.
2d. In their absence/frora the United Slates*, resignation or death, that their places is to be filled by one or two commissioners as the case may be,. and requires the commissioners to be appointed by the governor of the State, and any one of the judges of the Supreme Court, and the judge of the First Judicial District Court, or any two of them to malte the appointment of the commissioners, who will be entitled to a yearly salai'y of fifteen hundred dollars each. There is no commissioners, however, to be appointed until the death or resignation of two of the testamentary executors, who will be entitled to the same salary, say fifteen hundred dollars per annum, and when it becomes necessary to appoint one or more commissioners, the first must always be a Scotchman, aud lastly when the whole three has to be appointed by the officers of the State', one of which number must always be from my native country. They must be moral, correct, honest and intelligent men, and under a good character. Any two of the judges can dismiss them for any great or strong presumptive crime. They must keep an office and employ a clerk at a salrry of fifteen hundred dollars per annum. He must keep a set of books and accounts, which must be examined and approved annually by any two of the judges.
Art. 3 My estate is not to go into court except for the purpose of probating and of opening of the wills, havingno forced heirs, but every thing belongingto my estate is to be continued and conducted as it may be found at my death. The executors or commissioners to keep upon each plantation a good planter and a man of humanity. He must not, under no circumstances, treat the blacks with cruelty, but on the contrary with kindness; and they must allow for every grown person that labors, three pounds of good beef or pork per week, and in that proportion for all the young ones. There must be strict discipline and good order kept amongst all the negroes, and in all their quarters. I have always considered this allowance, with what they made upon their own patch of ground, which must be allowed to all those that labor, as an abundance; more particularly so if they get as much good fresh cornmeal as they stand in need of This treatment, in my humble opinion, places the black in a much more and happier situation than many of the lower order who has to labor in Europe, or‘even in the Eastern States. I have always treated my blacks with much indulgence, and even personal kindness.
Art. 4. I have always been opposed to slavery, but as it is a property recognized by the Constitution of ihe United States,.to take that away, you would at once destroy the greatest *459 and best regulated government nowin the Oidor New World. Therefore, all attempts made by tbe fanatics or misguided people thatls going about and preaching, like evil spirits, against slavery, turns the heads of the unfortunate negroes, and prepares them for the commission of every kind of crime, which compels their masters to limit the very liberty which they formerly awarded to them. In a great moral point of view a good master ought to be as care* fill of his slaves as be is of bis own family. All those who forget this duty has much to account for; but I am decidedly opposed to tbe people of any other State or country, interfering in any manner with our domestic concerns.
Art. 5. There must be written rules for -tbe government of all my slaves upon all of my different estates. They are not to be taken oat to work until nearly sunrise in the morning, nor are they to be kept in the field longer than half an hour after sundown in the evening. Sunday is to be a day of rest upon all my plantations, except the people who may choose to work upon their own piece of ground, or to be paid for their labor by their overseer, but under no circumstance are «they-tp be permitted to leave their respective camps without permission from their overseei*. It is clearly understood, however, that during tbe time that they are engaged in taking off the sugar and cotton crops, they are to work as they formerly did; because, by their care and labor every thing is to be made, and by that the comfort of themselves and others are to be secured.
Art. 6. All the children that is born five years after my death, if females, are to be free at the age of twenty years, and male children at the age of twenty-five; and at the end of the five years as aforesaid there may be.drawn by lot, out of all the slaves ten, five females and five males who will be furnished with a free passage to our settlement in Africa, and one hundred dollars each ; but they must go of their own free will, and to return to slavery, if ever they return back to this country. At the end of ten years twenty may be emancipated in the same manner as the first five; and in twenty-five years all the first born free may be sent off with the entire remainder of the old stock that is willing to go, so as that at the end of twenty-five years from my death, there will not he upon any of my estates any other slaves but the apprentice children. And if the other slaves did not wish to go to Africa, they will remain upon their respective plantations upon which they reside as apprentices, and to be provided for accordingly, but to be strictly under the management of the overseer, as well as all their offspring, the whole tobe considered as apprentices, and their labor to be applied to the general good of all the affairs of my succession.
Art. 7. It must be clearly understood, that the benefit now granted to my slaves it not to extend.to a murderer or thief, or a confirmed runaway, or for any other high crime that can be legally proved before the executors or the commissioners, which they have been guilty of; but at the same time I wish the negroes to have a fair, just and impartial trial, the same in point of fact, as if they were tried before a judicial tribunal.
*460 Art. 8. Some arrangement must be made with Henry Doyal, who is one-half owner of the Mount Jioamas plantation and slaves, by selling the land to him at the end of the first five years, he in the meantime must liquidate his account at his leisure, paying no more interest upon any balance that may be due to my estate than six per cent per annum. The negroes upon the Houmas estate to be emancipated upon the same conditions as those upon the other plantations, onerhalf of them being already my property, Mr. Doyal would, no doubt, make an agreement with the executors for those belonging to him. Everything, however, must be settled with Mr. Doyal within ten years after my death. He has been a faithful agent and partner in the management of these estates, I therefore recommend him to the indulgence and notice of the executors.
Art 9. The Destrehan estate is to remain forever as apart of my succession; and at the end of twenty-five years from my death, it must be laid out into a city to be named Dcstrelian.
Art. 10. Four acres, including the back and front garden, running back with parallel lines to the lakes, with all the dwellings to remain as one lot, with a good street, and buildings upon each side oí said street.
Art. 11. All my real estate in the city to remain upon ground rent, and no lease to exceed twenty-five years in time, all the stocks to be sold in ten years from my death.
Art. 12. I'leave the following legacies, having no forced heirs, to my brother John Henderson, or to his heirs, if dead, two thousand dollars per annum, and to be paid upon due proof, and to the proper person authorized to receive the sam.e, say $2000. Ditto two thousand dollars to my sister Ann Henderson, or to her heirs, and to be paid upon the same terms and conditions, say $2000. Two thousand dollars to my nephew, Stephen Henderson, Jr., or to his heirs, if dead, and upon the same terms as to the family of John Henderson, say $2000. Two thousand to the children of my late nephew Geo. Henderson or to their heirs, and on the same conditions, say $2000. Two thousand dollars to be paid annually to the poor of the parish of Orleans, to be distributed by persons appointed for that purpose by the governor, one of the judges of the Supreme Court, and the judge of the Court of Probates for the parish of Orleans, $2000. Two thousand dollars per annum to be paid to the poor of the town of Dunblane, in Pertshire, North Britain; this sum to be divided by the resident minister of the Presbyterian church, and to the two highest civil officers in the town to be paid upon due proof of their acceptance of the trust, say $2000. Two thousand dollars for the erection of a school house in the town of Dunblane, for ten years only, and for the purpose of educating of the poor, this being the place of my birth. I feel no obligation, however, for these acts of charity. It is only done to help the poor, who like myself may he thrown upon the world without a penny or a friend. My greatest object is to do the greatest quantity of good, and to the greatest number of persons and to the poorest people. I shall leave the world without regret, believing that I shall go to a better and happier one, and God grant that all man *461 kind maybe pi*epaved fortius last, eternal and awful change; as it is the immutable laws of Heaven that we must all die, let us be ready and prepared as nearly as we can.
Art. 13. When funds can be spared after twenty years, I wish a large manufactory of negroe shoes and coarse clothes to be ejected at Destrehan, under the direction of experienced workmen from Scotland. Destrehan city mast be incorporated by an act of the Legislative. If these manufactories arc well conducted, it will be the means of doing much good to the country, and give employment to a great many of the poor, a?id it will, no doubt, be the means of stimulating a great many of the young men to exert themselves, because by perseverance and industry they see what can be done. My whole family may be considered as a family of drunkards, and this misfortune must have come upon the side of my father, although thathewas an antiquarian, learned and intelligent, yet to get drunk once a month was to him a jubilee. My mother was a Drummond, a descendant of the Me’Gregors, good natured, but without much capacity; they were honorable and high-minded as respects their intercourse with others, but profligate and indolent as respects the management of tlicir private concerns; being poor they were always in bankruptcy.
Art. 14. After the first five years, the executors will divide the following sums amongst the four following congregations, say, Clapp’s Church two thousand dollars; Catholic Cathedral two thousand dollars; the English Church in Canal street two thousand dollars, and the church commenced by Maffit two thousand dollars; and the Orphan Boys two thousand dollars, and to the Orphan Female Society two thousand dollars ; the legacies to the four churches is only to remain and be payable for five years ; but all the others so far named are to be perpetual. Two thousand dollars per annum to the Charity Hospital; five hundred dollars per annum to the Firemen’s funds : this last class of people are much exposed, and ought to be protected. My house furniture and plate to be sold, and the proceeds applied to the erection of a tomb to be erected over my grave, and my burying place must be the Church of St. Charles, and to be interred alongside of my late beautiful and accomplished wife ZeliaD. Henderson, the whole tobe surrounded by a neat iron railing, and the tomb as well as the railing to be keptin good order by the executors. Mrs. R. A. Rost will receive all my diamonds and jewels, that belonged to her late sister, giving a part to Mrs. Marigny of such of them as she thinks fit.
Art. 15. I wish a chapel or church to he erected upon the upper corner of the four acres lot, and a Presbyterian minister to be sent for from Dunblane or its neighborhood, at a moderate salary. I also wish a good house for the minister to be erected upon the lower corner of the four acres lot. There must also be a small house for the education of the poor of the town, over which the minister must preside.
Art. 16. All my debts, if any, must be settled and liquidated before any of the legacies is paid. There must be no exception taken to this will, either on account of form, writing or spelling.
*462 Art. 17. Upon mature reflection I have concluded to name the Destrehan plantation when it is incorporated as a city, Dunblane in place of Destrehan as named in the foregoing. As life is uncertain, I will sign this will as it.is written, in haste, and add a codicil to it hereafter, if it is necessary hereafter.
New Orleans, 1st of August, 1837. (Signed,) S. Henderson.
Nevanetur, New Orleans, 14th March, 1838. (Signed,) J. Bermudez, Judge.
Be it remembered, that on the fifth day of March, one thousand eight hundred and thirty-eight, Stephen I-Ienderson of the city of New Orleans, being in his house in Canal street, sick of body, but sound of mind, presented to the undersigned witnesses, all residing in the city of New Orleans, this paper which he had caused to be written out of their presence, and declared to them that it contained his last will.
On the first of August eighteen hundred and thirty seven, I made an olographic will disposing of all my property for the following objects. 1st. The payment of all my just debts.
2d. The payment of certain legacies therein specified.
3d. The erection and gradual improvement of a new city.
I intended to have made various changes and additions to said will, which circumstances (have prevented me from doing, and the present will is made to remedy any error of law or fact, or any other deficiency to be found therein.
I do hereby confirm said will in all its clauses, and it is my wish and request that all my debts be punctually paid, and that all the dispositions contained in said will in relation to the erection and gradual improvement of the new city ordered to be erected by said will he carried in full effect, agreeably to the true intent and meaning thereof.
I hereby make anew each of the particular legacies contained in my said will, in favor of each of the legatees purely and simply, and it is my wish and desire that any property of which I may die possessed, not passing for any cause whatever under any of the dispositions of any former will, or of this, may accrue to them in proportion to the amount of their respective legacies,-or their value.
In remuneration of their faithful services I give their freedom to my house servants Lucy and Agnes. They will be emancipated next fall, and in the meantime remain in my house in Canal street.
The jewels of which I may die possessed, will he divided between my nieces Louisa Foucher and Adilla Marigny, and the oldest daughter of my nephew George Henderson, deceased, in the following manner, Louisa Foucher will receive the breast-pin with my portrait set in diamonds; Adilla Marigny will take the medallion of diamonds, and the daughter of George Henderson shall receive the balance of the jewels, whatever they may be; she will further receive all the woman’s apparel made or not made, found in my possession, and the miniature portrait of my late wife, Mrs. Henderson. I give all the family pictures which I have to Mrs. Rost and her sister Mrs. Grilhe.
*463 I give and bequeath to Henry Doyal of Mount Houmas, the carpets, looking glasses, side board, curtains and pier tables of my drawing room, and of my dining room, also two bedsteads, one armoir, and ono-balf of the bedding and table cloth in my New Orleans house, to be used by him to furnish the new house which he is about to build on the Mount Houmas plantation-, and not otherwise. The rest of my household and kitchen furniture will be sent to my three other plantations ; one press and a part of the bedding and table eloth will be sent to each of the cotton plantations.
It is my will and desire; and I do hereby revoke the appointment which I had made in my former will, of my nephew Stephen Henderson as one of my trustees, my reasons for doing so are that liis duties are such, would take too much of his time, but ho shall receive all the legacies made to him; and I further bequeath him the sum of five hundred dollars payable immediately, and’also payable annually the amount to which he would have been entitled for commissions as trustee had he acted, on condition that ho shall pay over to the heirs of George Henderson one-halfof the amountof such annual payment. I also give andbequeath to him my gold watch, my wslking cane, and all my wearing apparel, without exception, linnen, cloth, &c.; and I give and bequeath to Peter A. Rost my carnation breast-pin, being the one I wear, together with my guns. I give and bequeath my diamond breast-pin to Jonathan Montgomery, and I further give and bequeath all my stock of wine to the said Peter A• Rost and Jonathan Montgomery jointly.
It is my wish and desire, that next fall a competent person be employed who will give all his time and attention to the affairs of my estate, and the management of my plantations ; and that a suitable compensation be allowed him. Philip Rockford will be employed until that time, and should his services as clerk be no longer necessary, he shallreceive out of my estate the sum of one hundred dollars, besides his salary. If deemed necessary to carry my two wills into effect, and not otherwise, I appoint Jonathan Montgomery and Peter A. Rost my testamentary executors and give them the seizin of my estate.
The foregoing last will was then read by Theodore Clapp, one-of the witnesses, to the other witnesses, in presence of the testator who approved the same in all its parts, but did not sign it, being unable to do so, as he stated, on account of weakness; and the’ same was then signed by all the witnesses, without passing to other acts, the day, month and year above written.
(Signed.) R. D. Shephard. R. Davidson. Theodore Clapp. J. Towro. David C. Her. J. Monroe Machie.
Ne varietur, New Orleans, 14th March, 1838. (Signed,) J. Bermudez, Judge.
A true copy, (L. S.) W. K. Wanton, D’y Clerk.